```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION
```

| | |
|---|---|
| 360NETWORKS TENNESSEE, L.L.C., formerly known as IC Fiber Tennessee, L.L.C., <br><br> and <br><br> 360NETWORKS MISSISSIPPI, L.L.C., formerly known as IC Fiber Mississippi, L.L.C., <br><br>     Plaintiffs/ <br>     Counter-Defendants, <br><br>     v. <br><br> ILLINOIS CENTRAL RAILROAD COMPANY, an Illinois corporation, <br><br>   Defendant/Counter-Plaintiff, | Case No. 05 C 3198 <br> CONSOLIDATED WITH <br> Case NO. 05 C 3200 <br><br> Hon. Harry D. Leinenweber |
| ILLINOIS CENTRAL RAILROAD COMPANY, an Illinois corporation, <br><br>              Plaintiff, <br><br>     v. <br><br> 360NETWORKS LOUISIANA, L.L.C., formerly known as IC FIBER LOUISIANA, L.L.C., <br><br>              Defendant. | CONSOLIDATED WITH <br><br><br> Case NO. 06 C 5558 |

### MEMORANDUM OPINION AND ORDER

This case arises out of a fiber optic cable installation project along a railroad right-of-way; the parties dispute who must bear the substantial cost of relocating the cable due to the

reconstruction of old and decaying timber bridges between Chicago and New Orleans. Both parties have moved for summary partial summary judgment on the issue of liability (but not damages).

## I. BACKGROUND

The following facts are uncontested, except as noted.

Defendant Illinois Central Railroad Company (hereinafter, "IC") owns and operates a railroad between Chicago and New Orleans. On May 28, 1999, Plaintiffs 360networks Mississippi, 360networks Tennessee (hereinafter, collectively, "360") and 360networks Louisiana entered into license agreements (hereinafter, "the Agreements") with IC to construct and operate fiber optic facilities along IC's right of way in Mississippi, Tennessee, and Louisiana. For use of the right of way, 360 paid IC a fee and provided IC with limited use of the fiber optic facilities. The Agreements were amended and restated on March 6, 2000.

In 1998, Canadian National Railway (hereinafter, "CNR") and IC merged; pursuant to this merger, CNR filed an application to acquire control of IC with the Surface Transportation Board (hereinafter, "the STB"). This application included an operating plan that set forth various representations with respect to maintenance of facilities. Specifically, CNR and IC represented that "CN/IC will not hesitate to make investments in yards, terminals, rail lines, equipment, and systems where necessary to improve service to our customers and increase the efficiency of

operations." At the time of the merger, IC had an existing plan to replace many of the timber bridges with more modern steel and concrete bridges. IC has not indicated to this Court that any specific representations were made concerning bridges (specifically or generally). The STB permitted the merger.

360 was informed of the plan to replace the timber bridges prior to installation (the parties appear to dispute the exact time 360 was informed of IC's bridge reconstruction plans). The Agreements provided that 360 must install the cables "so as not to unreasonably interfere with IC's operations." As a result, the parties agreed that 360 would not attach the cable to the existing timber bridges, but would instead use a technique called a "directional bore" to (presumably) run the cable under the waterway. This technique was substantially more expensive than the more commonly used method of attaching cable to an existing bridge. At the project's initial "kick-off" meeting between the parties, an IC engineer suggested that the cable be installed at the edge of the right of way to facilitate this reconstruction and to avoid necessitating relocation of the cable during such reconstruction. The parties dispute the importance of these statements.

360 installed the cable in a 1,000 mile build. The Agreements provided that 360 would submit so-called working drawings of the route to IC prior to construction for IC's approval. IC asserts that this procedure was not followed as working drawings were never

submitted. 360 appears to argue both that the working drawings were approved in the field by IC engineers and that it submitted working drawings to Mr. Lowe, IC's division engineer in the Midwest division. Mr. Lowe does not recall receiving the working drawings, and IC asserts that it did not receive any. No working drawings were disclosed by either party during discovery; 360 asserts that they were destroyed after the installation. The Agreements provided that if IC did not object to submitted working drawings within a specified period of time, then they were deemed approved.

Some IC representatives were present when the route was staked and during installation, but the parties dispute exactly what authority these representatives had. 360 asserts that the route was jointly staked with IC engineers, the engineers signed off on the placement of the cable in relation to the railroad tracks, and the engineers at times advised 360 to lay the cable on particular sides of the tracks due to planned future improvements and construction. 360 has not named a single IC engineer present during staking or installation. IC asserts that no representative of the IC engineering department was present during the staking or installation. The parties appear to agree that IC representatives responsible for flagging, safety, and/or the preservation of railroad property were on-site during the staking process and installation. For the most part, the cable was installed six feet away from the tracks and approximately four feet underground;

however, some of the cables were closer.  None of the cable was installed at the edge of the right-of-way.

Fast forward to August 13, 2002.  An IC construction crew accidentally cut through the fiber optic cable while replacing a bridge near Memphis, Tennessee.  IC claims that this was the first time that it was aware that the cable was not installed on the edge of the right-of-way; 360 asserts that IC had been aware of this fact all along (as its engineers were present for and helped with staking the route).  360 gave IC "as-built" drawings of the route in September 2002, which showed the begin bore and end bore locations at the bridges.  IC asserts that these drawings are not in sufficient detail to determine how far off the bridge the cable had been installed.  There are some inaccuracies in these drawings.

Eventually, IC determined that replacement of the timber bridges would require relocation of the fiber optic cable, regardless of the fact that the cable was not attached to the bridges.  (The parties dispute whether IC determined this before or after the accident in Memphis or before or after it discovered that the cable was not laid on the edge of the right of way).  Now, IC and 360 dispute who should bear the cost of the relocations – IC or 360.  The Agreements addressed the possibility of cable relocation and provided that 360 would bear the cost if the relocation were ordered by any authority with jurisdiction to do so, but that IC

would bear the cost if the relocation was undertaken for any other reason (specifically including preplanned work).

## II. **STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it could affect the suit's outcome under the governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view all the evidence and any reasonable inferences therefrom in the light most favorable to the non-moving party. *See Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000).

## III. **DISCUSSION**

Both parties have moved for summary judgment. IC argues that 360 breached the Agreements' requirement to install the cable properly in accordance with IC's standards and in a manner so as not to interfere with IC's operations, and should therefore bear the relocation costs. 360 argues that pursuant to the Agreements' relocation cost provisions, IC must bear the cost for the relocation of the cable, as IC was not ordered to undertake the

bridge reconstruction by any authority and the bridge reconstruction was preplanned work.

### A. Choice of Law

The parties have submitted briefs that are primarily devoid of legal citation. While the Court is aware that this case will turn primarily on the facts, some legal reference would have been helpful to frame the issues.

The parties have not raised or otherwise addressed the choice of law issue. Jurisdiction is based on diversity of the parties, and federal courts "sitting in diversity apply the choice of law rules of the forum state to determine the applicable substantive law." *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). Illinois courts follow the approach set forth in *Restatement (Second) of Conflict of Laws*, which refers courts in contract cases either to a choice of law provision in the contract or to the place of performance. *Midwest Grain Products of Illinois, Inc., v. Productization, Inc.*, 228 F.3d 784, 787 (7th Cir. 2000). The Agreements contain an express choice of law provision designating Illinois law; thus, this Court will apply the law of Illinois.

### B. Breach of Contract

IC argues that 360 breached the Agreements by failing to install the cable at the edge of the right-of-way, thereby necessitating the relocation of the cable during bridge reconstructions; thus, IC should not be required to bear the cost

of the relocations. Where a party has materially breached a contract, it will not be permitted to take advantage of any contract terms that benefit him or recover damages from the other party to the contract. *Advance Iron Works, Inc. v. John Edwards Const. Co.*, 2004 WL 2044123 at *9 (N.D. Ill. Sept. 9, 2004) (citing *Robinhorne Const. Corp. v. Snyder*, 251 N.E. 2d 641, 646-67 (Ill.App.Ct. 1969)). Apparently, IC argues that 360 materially breached the Agreements by failing to place the cable at the edge of the right-of-way, and therefore, regardless of the Agreements' relocation provisions, 360 should bear the cost of all relocations.

This Court cannot enter summary judgment on this basis. IC argues that 360 breached the Agreements' provision requiring that the cable be laid in such a manner "so as not to unreasonably interfere with IC's operations" and "in no case shall any portion of the Facilities . . . be located or operated in a manner that will unreasonably interfere with any operations of IC." IC appears to argue that because the cable was installed close to the bridges, and not at the edge of the right-of-way, the installation "unreasonably interfered" with IC's operations.

There is a genuine dispute regarding the underlying facts. The parties agree that an IC engineer told 360 (as reflected in the meeting minutes) that "many of the timber bridges south of the Ohio River are slated for replacement . . . reconstruction would use off track equipment and . . . [360] should stay on the edge of the

right-of-way to avoid possible future conflict [because] when replacing long bridges the track will generally be realigned." However, the parties dispute this statement's importance. IC asserts that this statement is the only evidence regarding the placement of cable at these bridges, and therefore is proof that the parties agreed to place the cable at the edge of the right of way to avoid the prohibited "unreasonable interference." Deposition testimony on behalf of 360 indicates that 360 staked the route (including, presumably, the begin and end bore locations at the bridges) jointly with IC engineers and that IC engineers signed off on the location of the installation. Additionally, the parties dispute whether working drawings were submitted to IC; if they were, and IC did not object to the placement of the cable near the bridges, then IC would have been deemed to agree to the placement of the cable. If IC agreed to or approved the specific placement of the cable, it cannot very well argue that the placement "unreasonably interfered" with its operations. (The Court is aware that IC argues that even if the working drawings were submitted, they lacked sufficient detail; as no drawings have been submitted to this Court, such claims will not be evaluated). Thus, this Court cannot grant IC summary judgment.

### C. Contract Interpretation

360 argues that partial summary judgment is appropriate because the contract provisions regarding relocation of cable

provide that IC must bear the cost of relocation.  This Court agrees that the Agreements clearly establish that IC must bear the cost of the relocation, absent a breach.

The Agreements included provisions that specified which party would bear the cost in the event of a necessary relocation of the cable facilities.  If the cable needed to be moved due to railway construction that had been ordered by an authority with jurisdiction to do so, the cost would be borne by 360.  In all other cases, including the case of preplanned work on IC's railway, the cost would be borne by IC.

IC argues that the work was ordered by an authority with jurisdiction to do so.  IC's argument is rather roundabout:  (1) IC operates the lines at issue under the mandates of the STB; (2) IC and CNR made representations to the STB at the time of their merger that "CN/IC will not hesitate to make investments in yards, terminals, rail lines, equipment, and systems where necessary to improve service to our customers and increase the efficiency of operations"; (3) when authorizing the merger, the STB directed that "applicants must adhere to all of the representations they made on the record during the course of this proceeding"; (4) this order imposed a mandate that IC improve its infrastructure as that improves service and increases efficiency.  IC directs this Court to *Illinois Central Railroad Co. - Purchase - Mississippi Control Railroad*, 348 I.C.C. 467 (1976), where the Interstate Commerce

Commission (hereinafter, the "ICC"), the predecessor of the STB, held that IC was bound to comply with specific representations (to upgrade a rail line to accommodate particular speeds) made during a bid to acquire another railroad. That case is distinguishable from the case at bar. There, IC made specific representations of a specific plan to improve a specific railroad to specific standards, and the ICC enforced that representation when IC failed to meet it. Here, IC made vague representations that it would improve service and increase efficiency - it apparently never mentioned timber bridges or bridges at all. It seems highly unlikely that the STB would attempt to enforce a vague statement such as the one that IC made, especially as there are no standards on which to measure compliance. This Court does not believe that the STB's order that IC comply with its representations constitutes an order to "make changes or alterations to IC's tracks." If IC had shared its already-planned bridge reconstruction project with the STB, this would be an entirely different story.

Instead, IC admits that prior to entering into the Agreements with 360, it planned to reconstruct a significant number of timber bridges. IC's argument regarding its representations to the STB and prior ICC decisions appear to be nothing more than an attempt to avoid the fact that the bridge reconstruction was preplanned and that the cost of relocation the cable fell on IC's shoulders. Permitting IC to redefine this preplanned work as work ordered by

an authority would render the preplanned work clause ineffectual, and contracts should be read to give effect to each clause. *Shorr Paper Products, Inc. V. Aurora Elevator, Inc.,* 555 N.E.2d 735, 737 (Ill.App.Ct. 1990). As the Agreements specifically provide that relocations due to preplanned work will be paid for by IC, the Court finds that the Agreements provide that IC will bear the cost of the relocation in the event that the Agreements were not breached.

This finding does not dispose of the liability issue in this case. As noted above, if 360 breached the Agreements by not installing the cable on the edge of the right of way, then 360 cannot expect to have the Agreements' provisions imposed in its favor. *Advance Iron Works,* 2004 WL 2044123 at *9. Thus, trial will be necessary as to the issue of the possible breach of the Agreements by 360.

### IV. CONCLUSION

For the reasons stated above, this Court grants, in part, 360's Motion for Summary Judgment with respect to IC bearing the cost of relocation, and denies IC's Motion for Summary Judgment in full.

**IT IS SO ORDERED.**

      Harry D. Leinenweber, Judge
      United States District Court

Dated: May 10, 2007